Application of WHITMER et al.

Patent Appeal No. 5389.

Court of Customs and Patent Appeals.

April 2, 1948.

Richey & Watts, of Cleveland, Ohio (Blythe D. Watts, of Cleveland, Ohio, and Watts T. Estabrook, of Washington, D. C., of counsel), for appellants.

W. W. Cochran, of Washington, D. C. (E. L. Reynolds, of Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Presiding Judge, and HATFIELD and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

Appellants here seek review and reversal of the decision of the Board of Appeals of the United States Patent Office affirming that of the Primary Examiner rejecting all the claims, numbered 1 to 5, inclusive, of their application for patent entitled "Bright Polishing of Stainless Steel." All the claims are method claims and the introductory clause of each is "The process of bright pickling stainless steel." The rejection was on the ground of lack of invention over prior art as disclosed in a patent to James N. Ostrofsky, No. 2,335,-354, issued November 30, 1943. The examiner cited as an additional reference a publication referred to as "the Uhlig publication," but this was virtually dismissed as a reference by the board and is not before us. As stated in the brief for appellants, "The ultimate question presented here for decision is whether or not the claims define invention over the Ostrofsky patent."

In his official statement following the appeal to the board the examiner reproduced all the claims. The board selected as representative claim No. 1. We reproduce it and claim 4:

"1. The process of bright pickling stainless steel which comprises the steps of making an article composed of such steel the anode in an electrolyte initially containing from about 40% to about 70% of sulphuric acid by weight and from about 5% to about 20% of tartaric acid by weight, the remainder being water, and passing thru the article and electrolyte an electric current having a density of between about 1 amp. and about 4 amps. per sq. in. of anode surface."

"4. The process of bright pickling stainless steel which comprises the steps of making an article composed of a stainless steel of the 18-8 type the anode in an electrolyte initially containing from about 40% to about 70% of sulphuric acid by weight and from about 5% to about 20% of tartaric acid by weight, the remainder being water, passing thru said article and said electrolyte an electric current having a density of between about 1 amp. and about 4 amps. per sq. in. of anode surface for a period of time ranging from about 4 minutes to about 8 minutes while maintaining the temperature of the electrolyte between about 120°F. and about 150°F."

Claim 2 is the same as claim 1 with the additional limitation that the electric current is passed through the article and electrolyte "for between about 4 minutes and about 8 minutes."

Claim 3 describes the electrolyte as containing about 50% sulphuric acid by weight and about 10% of tartaric acid by weight. Otherwise, it is the same as claim 2.

Claim 5 differs from claim 4 only in designating the article treated as being composed of "stainless steel of the AA

type," and a temperature of the electrolyte of "between about 170°F. and about 200° F."

The first paragraph of the Ostrofsky patent specification recites:

"The present invention relates generally to the art of manufacturing stainless iron and steel, and more particularly to the finishing of stainless iron and steel products such as wire, rods, plates, sheets, strip, rounds, bars and the like and the articles fabricated therefrom."

The patentee states further:

"I preferably employ a solution comprising citric acid, sulphuric acid and water. I have found that a very high polish can be obtained where the proportions of the materials in the bath are approximately 55% citric acid, 15% sulphuric acid, and 30% water, by weight. These proportions, however, may be varied within relatively wide limits, depending upon the current density employed, the temperature at which the treatment is carried out, and the time of the treatment. Other factors also influence the operating conditions and the proportioning of the ingredients of the bath such as the nature of the material being treated and the character of the original surface thereof. I have also found that the character of the heat treatment, the grain size, and the amount of cold work done on the material has some effect upon the proportioning of the ingredients and the operating conditions to be employed. In the treatment of material of the character in question, the citric acid content of the bath can be varied from approximately 10% to 90% by weight; the sulphuric acid content can be varied from approximately ¼% to 70% by weight; and, the water can be varied from approximately 5% to 50% by weight. Little or no water is necessary if the treatment is carried out at an appropriate temperature to maintain the ingredients of the bath in a fused condition but I have found that it is better to use at least a small amount of water due to the fact that appreciably lower operating temperatures can be utilized."

The specification states that the density of current employed can be varied over a relatively wide range; that current densities of approximately ½ ampere per square inch of the material being treated and current densities of as much as 40 amperes per square inch have both been found to give "entirely satisfactory results"; that the current density to be utilized in any given case will be regulated according to the desired time of treatment, the character of the bath, the temperature to be employed and the nature of the material; that the temperature employed likewise may be varied throughout a substantial range; that the patentee preferably maintains the bath at a temperature between approximately 50° C. (106° F.) and 125° C. (265° F.); that the temperature should be sufficiently high to maintain the organic acid in solution; and that the time of treatment also may be varied over a relatively wide range, the patentee having found that "when the various factors are properly correlated * * * extremely high polishes can be obtained in a relatively short period of time varying from ½ minute to 3 minutes."

Another paragraph of the specification reads:

"While I have stated above that I preferably employ a solution of citric acid, sulphuric acid and water as the electrolyte, I have found that any of the organic acids the stainless salts of which will permit ready flow of corrosion products away from the anode during the treatment will give satisfactory results in the bath. I have found that acetic acid, tartaric acid, formic acid, lactic acid, maleic acid, malic acid, succinic acid and glyceric acid will give good results."

Still another paragraph states:

"While I have stated above that I prefer to use sulphuric acid in the bath, I have found that satisfactory results can be obtained where any soluble compounds containing a sulphate radical is employed."

The patent sets out seventeen examples "By way of example and not by way of limitation," of treatments which the patentee states he found "to give excellent results," and it embraces fourteen claims, most of them being quite broad in that they do not state the relative proportions

of organic acid (such as citric acid) and inorganic acid (i.e. sulphuric acid or a sulphate radical) used, or, where such proportions are stated, the ranges of percentages of both acids are extremely wide. The examples also are very broad. For illustration, example No. 1 recites "using 2% to 60% sulphuric acid, 10% to 80% citric acid and 20% to 40% water."

Obviously it would require considerable time in which to calculate and considerable space in which to state the number of combinations of sulphuric acid, citric acid and water which might be made within the limits of the percentages so stated in example No. 1. The same is true of all the examples and claims of the patent which designate ranges of percentages, and it is true also of the appealed claims.

The following is taken from the brief on behalf of appellants:

"Ostrofsky's patent gives the impression that he had investigated the whole field thoroughly. His teaching is comprehensive in that it mentions many acids and fixes percentage ranges of the acids which are exceptionally wide. It says that the amount of citric acid may range from 10% to 90% of the solution and that the amount of sulfuric acid may range from 1/2% to 70% of the solution. It is detailed in that it requires that the solutions must contain at least 50% of total acids, that the amount of inorganic acid should not be sufficient to cause substantial metal losses, and that the amount of organic acid should exceed that of the inorganic acid. It shows that substantial metal losses occurred with 30% of sulfuric acid in one instance. When such losses occur the metal surface becomes pitted and roughened, * * *"

It was held in effect by both the examiner and the board that when some organic acid other than Ostrofsky's preferred citric acid is used the substituted acid is to be regarded as being of the same percentage or range of percentages as the citric acid displaced. To illustrate, if tartaric acid be substituted for citric acid in Ostrofsky's example No. 1, the pertinent part of the example would read "10% to 80% tartaric acid." While certain of the reasons of appeal might be construed as challenging the correctness of this holding, the ques-

tion is not argued in the brief and we take it that appellants acquiesced in the ruling.

The patent recites examples in which different organic acids were used instead of citric acid, and different of the claims named different organic acids. Thus, claims 1, 2, and 6 to 13, inclusive, named aliphatic carboxylic acid (which we understand includes tartaric acid); claim 4 names acetic acid; claim 5 names tartaric acid and a sulphate radical instead of citric acid and sulphuric acid (but gives no percentage of either); and claim 14 also names tartaric acid without giving any percentage of either it or of the sulphuric acid, but states that the total water content is about 32% by weight. Several of the claims name "a sulphate radical" instead of naming "sulphuric acid."

We do not deem it necessary to recite in detail the differences as to the number of amperes constituting the density of the current which is passed through the bath in following the process of the patent. The examples in the patent state different numbers but only two of the claims give numbers and both of them recite 1/2 to 40 per square inch of anode surface, the metal which is being treated, of course, being the anode.

No one of the claims of the patent states the time during which the treatment takes place; the examples range from thirty seconds in example 14 to three minutes used in most of the other examples. As has been stated, the specification recites temperatures of from 100° C. to 125° C. The patent mentions only the treatment of 18-8 type of stainless steel, the type specified in appellants' claim No. 4, supra, type AA designated in appellants' claim 5 not being named. This, however, is not claimed to be of any importance upon the issues here.

While two of the patent claims name tartaric acid instead of citric acid as the organic acid, only one example specifying it by name is given. That is example 14 which reads:

"Where the bath was composed of 60% tartaric acid, 8% sulphuric acid and 32% water, good results were obtained by using

498

a current density of 10 amperes per square inch for a period of thirty seconds, the bath temperature being 100° C. [212° F.]"

It will be observed that each of the appealed claims requires only from 5% to 20% of tartaric acid as against the 60% named in the example (neither of the patent claims which specifies tartaric acid states any percentage but some of those naming aliphatic carboxylic acid state percentage ranges) and 40% to 70% of sulphuric acid as against 8% named in the example.

It may be stated at this point that, as is pointed out, in substance, in the brief for appellants, neither any claim nor any example which states definite percentages in the electrolyte composition recites more than 15% of inorganic (that is, a sulphate radical or sulphuric) acid or less than 46% of organic (that is, such as citric, acetic and tartaric) acids but where ranges of percentages are given there is, in every instance, a degree of overlapping of appellants' ranges and the ranges of the patent.

This is recited in the brief of the Solicitor for the Patent Office as follows (references to pages of the record omitted):

"Ostrofsky * * * discloses the use of 10% to 90% of tartaric acid and ¼% to 70% of sulphuric acid. These values include two-thirds of the tartaric acid range (5% to 20%) set forth in [appellants'] claim 1 and the entire sulphuric acid range (40% to 70%). It will thus be seen that the reference expressly suggests the use of percentages of these materials falling within the ranges of claim 1, and that the ranges of the reference and the claim overlap to a very substantial extent."

In its decision rendered May 16, 1946, the board said, inter alia:

"Appellants emphasize that the ratio of sulphuric acid to organic acid in the present process is much greater than in the patent. In fact the situation in the patent is just the reverse for the patent emphasizes the use of a greater percentage of organic acid than sulphuric acid. We have given due consideration to this point but we do not deem it sufficient to over-

come Ostrofsky as a reference. We believe that it would be natural for one working in this art to experiment further and to use a preponderance of sulphuric acid over the organic acid. We are of the opinion that what appellants have done was merely carrying forward the teachings of the patent."

Appellants filed a request for reconsideration which the board, after discussion, denied "with respect to making any change in our former decision." The pertinent portion of its discussion stated:

"* * * this Board held that the claims on appeal were substantially met by the Ostrofsky patent. In Example 14 the patent shows the use of tartaric acid and sulfuric acid in the bath, but the percentages used were different from that specified in the claims. However since in the various examples given in this patent percentage range of the various acids that could be used was rather wide we could see no invention in trying out mixtures in which the sulfuric acid was in excess of the tartaric acid used. * * *"

During the prosecution of the case in the Patent Office three affidavits were filed on behalf of appellants. Two of them were by Odar, one of the joint applicants. The first affidavit dated February 19, 1944, appears to have been directed to matters embraced in a publication identified as a "Field et al." publication, the only reference cited by the examiner in an office action adverse to the claims taken January 9, 1943.

In an office action of September 9, 1943, the examiner, adding the Uhlig publication, hereinbefore referred to as an additional reference, again rejected the claims and declared the rejection final. However, there seems to have been a reconsideration by the examiner in connection with an amendment tendered by appellants and a new oath which had been required, and in a letter of March 7, 1944, the claims were again rejected with the Field et al. publication cited, and also the Ostrofsky patent. The second affidavit of the party Odar reciting the carrying out of a number of experiments was filed April 11, 1944, as a response to the examiner's letter of March 7, 1944, supra.

The third affidavit (which it is supposed was filed sometime between November 14, 1944, when it was dated, and November 17, 1944, when the appeal to the board was taken) was made by a party named Riegel who was, at the time of testifying, employed by the Republic Steel Corporation, being in charge of the corporation's research and development work on stainless steel. The examiner made no comment on this affidavit. He referred to the others briefly in prior office actions.

The board's only comment respecting the affidavits is:

"During the prosecution of this application numerous affidavits and samples were filed tending to show that a superior product could be obtained by appellants' process over that of the patent. Appellants emphasize the fact that they are not trying to show that the Ostrofsky process is inoperative but merely that it produces a product inferior to that obtained by the present process."

It is contended before us that the examiner rejected the claims upon the basis of his personal opinion, disregarding the factual evidence set out in the affidavits and, in effect, that the board did likewise, and insists that this was error.

It may be said that the purport of the affidavits is that numerous tests in the treatment of stainless steel wire, first and last, were made by or under the direction of Messrs. Odar and Reigel which appellants claim demonstrated that "None of the surfaces produced within the disclosure of the Ostrofsky patent would have been acceptable to the trade," while experiments, or tests, made in conformity with some of the ranges, etc., embraced in appellants' specification did produce surfaces which would have been acceptable to the trade.

The affidavits have been given full consideration by us but we are not convinced that they establish a state of facts which would justify reversal of the board's decision. Assuming a showing by the affidavits that by experiments carried out with the use of materials within the percentage ranges defined in appellants' application, and within the time units and under the temperature degrees defined therein, a product resulted which might be more "acceptable to the trade" than products resulting from applying the process defined in one or two of the examples embraced in the Ostrofsky specification, it does not follow from this that what appellants did amounts to invention.

Appellants have not challenged the operativeness of the Ostrofsky patent, nor have they demonstrated that the ranges, etc., stated in their appealed claims are critical as compared with the specification and claims of the reference.

The decision of the board is affirmed.

Affirmed.

By reason of illness, O'CONNELL, Associate Judge, was not present at the argument of this case and did not participate in the decision.